## WASHINGTON COUNTY RAILROAD COMPANY
### *vs.*
## CANADIAN COLORED COTTON MILLS COMPANY.

### Washington.    Opinion December 16, 1908.

*Quitclaim Deed by Mortgagee.    Trust Deed.    Power of Sale.    Conditions Authorizing Sale must be Observed.    Actual Possession by Trustees.    Trustees' Deed. Recitals Therein Prima Facie Evidence.    Deeds Construed.*
*" After Acquired Land."*

1.  A quitclaim deed by a mortgagee will release and extinguish his interest, when so intended.

2.  While the power of sale given·in a trust deed or mortgage must be strictly followed in all its details, the recitals in a trustees' deed to the effect that the conditions and terms of a sale prescribed in the instrument of trust have severally been complied with are to be taken as prima facie evidence of the facts recited, but not conclusive

3.· The requirement that the trustees, before sale, shall take actual possession of the mortgaged property to be sold is sufficiently met, in the case of the mortgage of a railroad, and lots of land owned by the railroad company, but not a part of the railroad itself, if the trustees are in actual possession and operation of the railroad, whether they are in actual possession of the outside lots or not. It is not necessary for them in such case, to enter upon and take possession of the separate parcels of land, outside of the railroad location, but contiguous to, and connected with it.

4.  *Held:*  That the sale by the trustees of the Calais & Baring R. R. Company mortgage of 1852 to the plaintiff's predecessor in title was regular and valid, and conveyed such title as the trustees then had.

·5.  When a trust deed conferred upon the trustees an express power of sale, but precisely limited the occasions and conditions under which the power could be exercised, and prescribed the essential prerequisites of a valid sale, an attempted conveyance by the trustees, made in disregard of those prerequisites and conditions, and without compliance with any of them, was inoperative to pass any title to the grantee.

6.  A mortgage deed of trust, by a railroad company to trustees of the "railroad and franchise of the company  .  .  .  as the same is now legally established, constructed and improved, or, as the same may be at any time hereafter legally established, constructed and improved  .  .  .  with all lands, buildings and fixtures of every kind thereto belonging, together with all real estate to said company belonging, also all locomotives    .  .

and all the personal property of the said company as the same is in use now, or as the same may be hereafter changed or renewed by said company," did not purport to include, and did not include, any after acquired land which might lie outside the railroad location, or which was not used or available for use, for the operation of the railroad ; and no after acquired land passed under such deed, except such as appertained to the " railroad " itself, as distinguished from the railroad company.

On report.    Judgment in accordance with opinion.

Writ of entry brought to recover certain land and flowage rights upon the St. Croix River in Calais.    Plea, the general issue.    The declaration in the plaintiff's writ is as follows :

"In a plea of land, wherein said plaintiff demands of said defendant certain real estate with its appurtenances in said Calais, to wit : the following described real estate situated in said Calais at Salmon Falls, so called, viz : all that part of shore lots numbers One, Two, Three, Four, Five, Six, Seven, Eight, Nine, Ten (1, 2, 3, 4, 5, 6, 7, 8, 9, & 10) according to B. R. Jones survey and plan of said Calais, which lies between the River St. Croix and a line drawn eight feet from the shore rail of the main track of the Washington County Railroad towards said river, and parallel with said Shore rail.    Also all rights of flowage at said Salmon Falls,—whereof the said defendant unjustly disseized the plaintiff within twenty years last past, whereupon the plaintiff says, it was seized of the premises as of fee within twenty years ; and said defendant disseized it thereof and unjustly withheld the same."

The action came on for trial at the April term, 1908, Supreme Judicial Court, Washington County and was heard before the presiding Justice without a jury.    At the conclusion of the testimony, it was agreed as follows :

"Under the pleading in this case and upon the foregoing report of evidence, documentary and otherwise, with the exhibits and legislative acts therein mentioned, the case is reported to the Law Court, said court to determine the rights of the parties to this writ of entry, and to render judgment therefor."

The case is stated in the opinion.

That portion of the mortgage deed of trust dated July 1, 1852, given by the Calais & Baring Railroad Company, containing the

description of the property thereby conveyed and the terms and conditions of the conveyance, is as follows:

"Now therefore be it remembered, that the Calais and Baring Railroad Company in consideration of the premises and of one dollar paid to them by the said John Wright, William Fiske and George Downes do hereby give, grant, sell, convey and mortgage to said John Wright, William Fiske and George Downes Trustees as aforesaid, and to their successors when appointed as hereinafter provided forever, the railroad and franchise of said Company in the City of Calais and Town of Baring in the county of Washington and State of Maine, as the same is now legally established, constructed and improved, or, as the same may be at any time hereafter, legally established, constructed and improved within those places from `its commencement in Calais aforesaid to its termination in Baring aforesaid, with all lands, buildings and fixtures of every kind, thereto belonging, together with all real estate to said Company belonging. Also all the locomotives, engines, passenger, freight, dirt and hand cars, tools, fixtures and machinery in the mechanic shops and all the personal property of said Company as the same is in use now, by said Company, or as the same may be hereafter changed or renewed by said Company. And furthermore, the said Company hereby transfer and assign to the aforesaid Trustees all the privileges, benefits, profits and emoluments accruing to them from a lease of the St. Stephen Railroad situated in the Parish of St. Stephen County of Charlotte and Province of New Brunswick made to them the said Calais and Baring Railroad Company. To have and to hold the said Railroad franchise, and estate aforesaid, whether real or personal with all the privileges and appurtenances, legislative grants, rights and privileges now granted or hereafter to be granted, and thereto in anyway pertaining to them the said John Wright, William Fiske and George Downes or their successors as Trustees, forever in Trust, for whomsoever, now are, or may hereafter become the lawful holder of said bonds or any of them.

"Provided, Nevertheless, and the foregoing deed is made upon the following terms and conditions.

VOL. CIV 34

"First.   The said Railroad Company shall never issue or have secured under this deed of Trust and of mortgage a greater sum in bonds as aforesaid than one hundred thousand dollars, said bonds are to be dated July first, A. D. 1852 and payable in twelve years at the aforesaid bank, with interest payable semi-annually at the same place, and they shall be signed by the president and treasurer, of said Company and have the certificate of one or more of the Trustees, aforesaid, that the same is secured by this deed of trust, and of mortgage.

"Second.   It shall be the duty of the said Railroad Company to pay the interest and principal of said bonds issued as aforesaid as the same shall become due and payable.   And, so long as said Company shall make no default of such payment, said Company may retain the actual possession of all said property to be used in the proper business and management of said Road and the Directors of said Company, notwithstanding this mortgage deed shall have the power and authority to change or renew from time to time any of the personal property hereby mortgaged, as they may deem necessary ;  and the property so received in exchange or renewal shall be holden by said Trustees under this mortgage in the same manner, as if the same had been owned by said Company at the time of the execution hereof, and included specifically in this mortgage deed.

"Third.   In case said Company shall fail to fulfil all or any of the obligations in said bond, or shall commit any strip or waste of the property of the said Company or shall dispose of, or apply the same to any use or purpose inconsistent with its proper use in the operation of said Road, the Trustees aforesaid or their successors, or a majority of the same may take possession of all the property aforesaid, and manage the same for the purpose of said Road, at their discretion and apply the net avails thereof to the payment or satisfaction of such as said bonds or may be outstanding against said Company or the interest thereon in full, or in such equal proportions to all as said avails may enable them to do.

"Fourth.   And in case said Company shall fail for six months to pay the interest or principal of said bonds as the same become due it shall be the duty of said Trustees, or their successors on the writ-

ten application of the lawful holders of a majority in amount of said bonds, then outstanding, to take actual possession of said property and make sale of the same at public auction on giving reasonable notice of such sale, in one newspaper at least published in Boston and one in said Calais, and after deducting all expenses of such sale and of this Trust, to pay over to the holders of said bonds, the whole or a ratable and equal proportion thereof, and the balance, if any, pay over to said Company and the said Trustees and their successors are hereby fully authorized and empowered irrevocably to make such sale, and make and execute conveyances passing all the rights, of this Company in the premises accordingly.

"Fifth.   In case a vacancy or vacancies shall happen in the Board of Trustees by death, resignation or otherwise, the Directors of said Company may fill all such vacancies by an appointment in writing to be attached to this deed, and such person or persons so appointed and accepting, shall have all the powers and be subjected to all the duties required of the original Trustees.

"Sixth.   And on the full performance of all obligations, conditions and stipulations in this deed, and the bonds referred to in the same by said Railroad Company to be done and performed then this deed to be void, otherwise in force."

The deed dated August 1, 1898, given to Frank E. Randall, and referred to in the opinion, is as follows:

"This Indenture, made this first day of August in the year one thousand eight hundred and ninety eight, between George A. Curran James Murchie and George A. Lowell, Trustees, parties of the first part and Frank E. Randall, of the City of New York in the State of New York party of the second part: Whereas, the Calais and Baring Railroad Company, a corporation of the State of Maine, did, on or about the first day of July in the year one thousand eight hundred and fifty two, by its certain mortgage or deed of trust dated on that day and recorded in the Registry of Deeds for the County of Washington in the State of Maine, in volume 75 pages 66 to 70 inclusive, grant, bargain, sell convey and mortgage to John Wright, William Fiske and George Downes, their successors and assigns all the property, rights and franchises

therein and hereafter described or mentioned, in trust, for the pay-
ment and security of whomsoever then were or might thereafter
become the lawful holders of any of a series of bonds then issued,
or about to be issued, by said Railroad Company, under authority
of An Act of the Legislature of the State of Maine, approved
January 30, 1852 entitled "An Act in relation to Bonds issued by
Railroad Corporations," each of said bonds being dated July 1,
A. D. 1852 payable July 1, A. D. 1864, and bearing interest at the
rate of six per cent, per annum, payable semi-annually; and Whereas
pursuant to and in compliance with the provisions of said mortgage
or deed of trust, the undersigned George A. Curran, James Murchie
and George A. Lowell, thereafter became and now are the successors
of said John Wright William Fiske and George Downes in the trusts
created by said mortgage or deed of trust; and Whereas, default
having been made in the payment of the principal of said bonds,
and such default having continued more than six months, and the
condition of said mortgage or deed of trust having been broken,
and the lawful holders and owners of all said bonds now outstand-
ing to wit, bonds for the principal sum, in the aggregate of thirty-
three thousand dollars ($33,000) having made written application
to the undersigned, as such trustees to take actual possession of said
property, rights and franchises and make sale of the same, as
provided in and by said mortgage or deed of trust, the said parties
of the first part as such Trustees did take actual possession of said
property, rights and franchises, and on the first day of August A. D.
1898, at ten o'clock in the forenoon at the Post Office in the City
of Calais, in the State of Maine, did sell the same at public auction
by W. H. Tyler a duly licensed auctioneer to the party hereto of
the second part, he being the highest bidder for cash, for the sum
of forty thousand dollars ($40,000) having first given reasonable
notice of such sale and the terms thereof, by publishing such notice
in the "Calais Times" a newspaper published in said City of Calais,
Maine, on the seventh, fourteenth, twenty-first and twenty-eighth
days of July A. D. 1898, and also in the "Boston Daily Journal"
a newspaper published in the city of Boston, in the State of Massa-
chusetts on the eighth, ninth, twelfth, fifteenth, nineteenth, twenty-

second, twenty-sixth and twenty-ninth days of July A. D. 1898, and by mailing a copy of such notice to each stockholder of record in said Company and also to each stockholder of record in the St. Croix and Penobscot Railroad Company, on the 9th day of July A. D. 1898, postage prepaid; such notice being given and such sale being conducted in all respects in accordance with the provisions of said mortgage or deed of trust.   Now, Therefore, This Indenture Witnesseth: that in consideration of the premises and of the sum of forty thousand dollars ($40,000) to said parties of the first part by said party of the second part paid, the receipt whereof is hereby acknowledged and in pursuance of the power and authority vested in them in and by said mortgage or deed of trust, the said parties of the first part, as Trustees aforesaid, have granted, bargained and sold and do by these presents grant, bargain and sell, remise, release, convey and confirm unto the said party of the second part his heirs and assigns forever, the railroad and other property rights and franchises described in and covered by the mortgage or deed of trust aforesaid, namely, the railroad and franchises now or formerly of the Calais and Baring Railroad Company in the City of Calais and town of Baring in the County of Washington, in the State of Maine, from its commencement at or near J. E. Eaton's planing mill, in Calais aforesaid, to its termination at or near Vance's Boom, in Baring aforesaid, with all lands buildings and fixtures of every kind thereto belonging, together with all real estate to said Company now or formerly belonging, and all locomotive engines, passenger, dirt, freight and hand cars, tools, fixtures and machinery in the machine shops, and all personal property now or formerly of said Company ; and also all the privileges, benefits profits and emoluments accruing, or to accrue from a lease of the St. Stephen railroad situated in the Parish of St. Stephen, County of Charlotte and Province of New Brunswick, heretofore made to said Calais and Baring Railroad Company ; meaning and intending hereby to convey all the property, rights and franchises of every description covered by said mortgage or deed of trust or by virtue thereof conveyed to or vested in said Trustees.

To Have and to Hold the same unto the said Frank E. Randall, party hereto of the second part his heirs and assigns forever.

In Witness Whereof, the said parties of the first part, as Trustees, as aforesaid, have hereto set their hands and seals this fifteenth day of August in the year one thousand eight hundred and ninety-eight.

Executed and delivered          GEO. A. CURRAN (seal)          Trustees
   in presence of          JAMES MURCHIE (seal)          as
George Downes for all.          GEO. A. LOWELL (seal)          aforesaid.

This deed was duly acknowledged by the grantors.

The material parts of the deed dated August 16, 1881, given to St. Croix Cotton Mill, and referred to in the opinion, are as follows:

"Know All Men By These Presents, that the St. Croix · and Penobscot Railroad Company a corporation established by law and having its principal office or place of business at Calais Washington County State of Maine, Zachriah Chipman George M. Porter and Lemüel G. Downes trustees under a certain mortgage given by the Calais and Baring Railroad Company dated July 1st A. D. 1852, . . . . Zachriah Chipman, Edward A. Barnard and Ephraim C. Gates, Trustees under a certain mortgage given by the Calais and Baring Railroad Company dated July 1st A. D. 1854, . . . . said St. Croix and Penobscot Railroad Company being the legal successors of said Calais and Baring Railroad Company. The City of Calais a Municipal Corporation in said Washington County mortgagees under certain mortgages given by said St. Croix and Penobscot Railroad Company dated August 11, A. D. 1870 and December 2d A. D. 1875, . . . . In consideration of one dollar and other valuable considerations paid by the St. Croix Cotton Mill a corporation established by the laws of the Province of New Brunswick Dominion of Canada and doing business at Milltown Charlotte County in said Province of New Brunswick the receipt whereof is hereby acknowledged do hereby remise release and forever quitclaim with the said St. Croix Cotton Mill their successors and assigns the following described real estate situate in

said Calais at Salmon Falls so called viz:    All that part of shore lots numbers One Two Three Four Five Six Seven Eight Nine and Ten (1, 2, 3, 4, 5, 6, 7, 8, 9, & 10) according to B. R. Jones survey and plan of said Calais which lies between the St. Croix and a line drawn eight feet from the shore rail of the main track of said railroad towards said river and parallel with said shore rail. Also all rights of flowage at said Salmon Falls reserving all side tracks switches wood sheds machine shops machinery and other buildings on the premises hereby conveyed and the bridge across said river and the right to maintain them as now maintained without any rent charge.    It is intended by this conveyance only to convey the soil and the water rights, and the right to erect and maintain dam or dams without damage expense or inconvenience to said Railroad Company upon condition that said Cotton Mill shall maintain such dam or dams as may be necessary to furnish said Railway Company with all the water power it may need in connection with the machine shop force pump and other properties at Salmon Falls . . . . It being expressly understood and agreed between all the parties to this deed that the buildings and machinery and rights reserved in this conveyance or any newly acquired property real or personal or mixed obtained by virtue of any of the provisions of this deed shall be held by said Railroad Company subject to the conditions of the existing mortgages on their property and the joining of the mortgagees in this conveyance shall not be construed to release from said mortgages any property other than the soil water rights and dam privileges hereby conveyed. . . . .

"To Have And To Hold the above released premises with all the privileges and appurtenances to the same belonging to the said St. Croix Cotton Mill their successors and assigns to their use and behoof forever upon the conditions above named."

This deed was duly signed, sealed and acknowledged by the grantors.

*Curran & Curran*, for plaintiff.
*Symonds, Snow, Cook & Hutchinson*, for defendant.

SITTING:  EMERY, C. J., WHITEHOUSE, SAVAGE, PEABODY, SPEAR, BIRD, JJ.

SAVAGE, J.   Writ of entry to recover so much of lots one to ten inclusive according to the B. R. Jones survey and plan of Calais as lies between the St. Croix river and a line drawn eight feet from the shore rail of the plaintiff company·; also certain flowage rights. The plea is the general issue.   The case comes up on report.   The following facts appear.   In 1852, the Calais & Baring R. R. Co. was the owner of a railroad in Calais and Baring, and of said lots 1, 5, 6, 9 and 10 and of an undivided half of lots 3, 7 and 8. In that year, by corporate vote, the directors of the Calais & Baring R. R. Co. were authorized and directed to execute a mortgage of the franchise of the company and all the property personal and real, and all the rights and privileges held by said company to trustees, to secure an issue of $100,000 of bonds.   Under this vote the directors later in the year executed a mortgage deed of trust to certain trustees of the railroad and franchise of the company in Calais and Baring "as the same is now legally established, constructed and improved, or, as the same may be at any time hereafter legally established, constructed and improved within those places . . . .  with all lands, buildings and fixtures of every kind thereto belonging, together with all real estate to said company belonging, also all locomotives . . . .  and all the personal property of the said company as the same is in use now, or as the same may be hereafter changed or renewed by said company." And in this mortgage it was provided that "in case the said company shall fail for six months to pay the interest and principal of said bonds as the same become due it shall be the duty of the trustees or their successors on the written application of the lawful holders of a majority in amount of said bonds then outstanding to take actual possession of said property and make sale of the same at public auction," and so forth.   Provision was made for filling vacancies among the trustees.   This mortgage covered the lots of the demanded premises which the company then owned, if no more.

In 1854, under a similar corporate vote, the directors executed a second mortgage deed of trust to trustees of the same property and with the same terms and conditions as expressed in the first mortgage, to secure an issue of $50,000 of bonds.   It does not appear whether any of these have been paid or not.

In 1856 the Lewy's Island R. R. Co., owning a railroad running through Baileyville, Maine, and St. Stephen, New Brunswick, mortgaged all the property and franchises which it then held, or which it might thereafter acquire, to the city of Calais, to secure the city for financial aid advanced.   In 1870, the Lewy's Island railroad having been acquired by the St. Croix & Penobscot R. R. Co., which was the Calais & Baring R. R. Co. under a new name, Calais conveyed all its interest in the Lewy's Island railroad property for $135,000 to the St. Croix & Penobscot R. R. Co., which on the same day mortgaged it back to Calais to secure the payment of the purchase price, and the performance of certain agreements.   In 1875 the St. Croix & Penobscot R. R. Co. made a second mortgage to Calais, covering not only the Lewy's Island R. R. property but its other railroad property formerly known as the Calais & Baring railroad, "together with all and singular the real estate  .  .  .  .  and all property and privileges appurtenant to said St. Croix & Penobscot R. R. Co."   This mortgage seems to have been given as additional security for a part at least of the liability secured by the mortgage of 1870, between the same parties.

In the meantime the Calais & Baring R. R. Co. in 1862 had acquired the title, it seems, of lot 4, an undivided half of lot 7 and 8, and a part, limited by bounds, of lots 2 and 3 of the demanded premises, and in 1874, the St. Croix & Penobscot R. R. Co. took a release deed of lots 3, 4, 5, 7 and 8.   These lots, therefore, as well as the lots originally owned by the Calais & Baring R. R. Co. were covered by the last mortgage to Calais.   In this connection it is to be remembered that the Calais and Baring R. R. Co. and the St. Croix & Penobscot R. R. Co. were one and the same corporation, the name of the former having been changed by the legislature in 1870.

In 1881, the St. Croix & Penobscot R. R. Co. which owned an equity of redemption in all these lots, the trustees of the first and second mortgages given in 1852 and 1854, respectively, and the city of Calais, which was the mortgagee in the 1875 mortgage covering these lots, all joined in a quitclaim deed of them to the St. Croix Cotton Mill, the predecessor in title of the defendant.

But it further appears that in May, 1898, Moore & Schley claiming to be "the holders of $43,000 of the first and second mortgage bonds of the Calais & Baring road" made written application to the persons who had then become trustees under the 1852 mortgage requesting them to institute proceedings for the foreclosure of the mortgage and the sale of the property. Accordingly the trustees gave notice, July 6, 1898, as provided in the mortgage, of their intention to sell the mortgaged property, and did sell it at public auction, August 1, 1898, to one Frank E. Randall. In the deed of the trustees to Randall it is stated that default for more than six months had been made in the payment of the principal of the bonds secured, that the applicants for the foreclosure and sale were the lawful holders and owners of all the bonds then outstanding, and that they, the trustees, took actual possession of the mortgaged property August 1, 1898. On August 15, 1898, Randall gave a deed of the same property to the plaintiff.

It further appears that on June 2, 1898, the city of Calais assigned to the J. P. McDonald Company its two mortgages from the St. Croix and Penobscot R. R. Co., given as already stated in 1870 and 1875 respectively. The McDonald Company assigned them to the plaintiff in 1899, and they have been foreclosed by proceedings in court. But it should be said that these assignments and this foreclosure do not affect the title to the lots in question. These assignments may have been effective as to the other mortgaged property, but, the city of Calais by joining in the deed of 1881 to the St. Croix Cotton Mill had released all its title to these lots. That was a quitclaim deed. But a quitclaim deed by a mortgagee may even convey his interest, if so intended, *Johnson* v. *Leonards*, 68 Maine, 237. Much more will a quitclaim deed by a mortgagee release or extinguish his interest when so intended.

Such was the undoubted purpose of the mortgagee in this instance, and such was the effect of its deed. These lots were no longer under the mortgage.

Upon the whole case, then, the plaintiff's title depends in the first place upon the validity and effect of the sale by the trustees in 1898, while the defendant rests on the title conveyed by the deed of 1881 to the St. Croix Cotton Mill. By that deed, it should be observed, the Cotton Mill acquired, at least, the title to the equity of redemption under the mortgage of 1852.

In order to prevail the plaintiff must show a better title than that of the defendant, and it can do this only by sustaining the sale by the trustees to Randall under the 1852 mortgage, for, so far as this case is concerned, the defendant's title is good against all persons except those claiming under that mortgage. Several objections are urged against the validity of the trustees' sale in 1898. First, that it does not appear that the interest on the bonds was six months overdue at the time application for a sale was made; secondly that it does not appear that the written application for sale was made by holders of a majority of the bonds then outstanding; and lastly, that the trustees did not take actual possession before sale, as directed in the trust deed. As to the first objection, it may be said in passing that the trust deed authorized a sale, when the principal should be six months in default, whether the interest was in default or not. But we do not think any of these objections are tenable.

It is a general rule, as stated in 2 Perry on Trusts, 2nd Ed. sect. 602, that "the power of sale given in the deed or mortgage must be strictly followed in all its details. The power of transferring the property of one man to another must be followed strictly, literally and precisely. . . . . If the power contains the details, the parties have made them important. . . . . If the power is not executed as it is given in all particulars, it is not executed at all, and the mortgagor still has his equity of redemption." And again in section 783,—"A power of sale, like all other powers, can be exercised only in the mode, and upon the exact conditions, terms and occasions prescribed in the instrument of trust.

But there are recitals in the trust deed which state in effect that all of the essential conditions prerequisite to a sale, existed at the time of the sale, namely, that the principal of the bonds was six months in default, that the application for sale was made by the holders of all the outstanding bonds, and that the trustees took actual possession before sale. We think these recitals are to be taken as prima facie proof of the facts. The rule is stated in 4 Ency. of Evidence, 183, as follows: "The recitals contained in a deed executed by virtue of a power of sale contained in a trust deed or mortgage that proper notice of the sale was given, and that other steps preliminary to a valid sale were complied with, are prima facie evidence against parties and privies to the instrument containing the power." The learned editor of the American State Reports closes a long note to *Tyler* v. *Herring*, 19 Am. St. Rep. 263, by saying: "The recitals made by a trustee surely must be taken as at least prima facie evidence of the matters therein stated." If such is not the rule, the title of purchasers would be exceedingly unstable, and purchasers or their grantees would be in an unfortunate predicament if compelled to make proof of title, after all means of proof outside the deed have disappeared. There is no such method of perpetuating proof of the facts as exists in case of official or statutory sales, where the officer making the sale is required to make some return or record of his doings aliunde his deed. In such case the recitals in the deed are not evidence, since the law has provided other means of proof.

But the recitals are only prima facie proof. They may be rebutted. In this case, the testimony of one of the trustees is reported on the question whether the trustees took actual possession before they made sale. The defendant contends that this testimony shows that they did not take actual possession of the demanded premises. We need not decide whether this is so or not. The case shows that the trustees at the time were in actual possession of the railroad and were running it. The distinctively railroad property of which they were in possession constituted apparently by far the larger and more important part of the mortgaged property, and covered some part of the lots in question. We think that that possession was sufficient.

The trustees being in possession of the railroad, it was not necessary for them to enter upon and take possession of the separate parcels of land, outside of the railroad location, but contiguous to, and connected with it. We hold, therefore, that the sale by the trustees in 1898 was regular and valid, and conveyed such title as the trustees then held.

Hereupon the defendant claims that by the deed of 1881, in which the then trustees joined, the entire legal title passed to the defendant; that the trustees thereby divested themselves and their successors of the power to make any future sale of the legal title; and, therefore, that the trustees' deed in 1898, if it had any effect, conveyed at the most only an equitable interest, and not a title which will sustain this action at law. We think this contention cannot be sustained. It is true that a conveyance of a trust estate by a trustee may pass the legal title to the grantee, even though the conveyance is not made in execution of the trust, and is made in violation of its purpose. Such a result will generally follow when the instrument creating the trust contains no restrictions either upon the power of sale, or upon the manner of exercising the power. But here the case is different. While the trust deed of 1852 conferred an express power of sale upon the trustees, it precisely limited the occasions and conditions under which the power could be exercised, and prescribed the essential prerequisites of a valid sale. Unless there was a default in payment of principal or interest of the bonds secured, and an application for sale by holders of a majority of the outstanding bonds, the trustees had no power to sell. Their want of power appeared upon the face of the instrument. Unless the trustees in making sale followed the requirements of the trust deed as to taking possession, giving notice and so forth, their deed was ipso facto void, and conveyed no title whatever. "The powers of trustees . . . . depend entirely upon the terms of the deeds. Such powers are created by and exist in the deeds, and, of course, they exist in the terms in which they are created, and in no others. . . . . They are wholly matters of convention and contract between the parties, and not of law or jurisdiction. . . . . It follows that the purchaser must look carefully to

the intention and purpose of the power as well as to its extent, for if it is executed . . . not in the manner in which it is provided that it should be executed, the purchaser will take no title." Perry on Trusts, sects. 602, g. and 602, t.    "When a power has not been executed in accordance with essential conditions, the sale and deed will be held entirely void, both at law and in equity." See note to *Tyler* v. *Herring*, 19 Am. St. Rep. 263.   It follows that the attempted conveyance by the trustees in 1881 was ineffectual to pass the title to the trust estate.    The conditions necessary to authorize a sale did not exist, and the steps necessary to make a sale valid were not taken.    Through the 1898 deed, then, the plaintiff has obtained title to all the land covered by the trust deed of 1852, notwithstanding the 1881 deed to the defendant.

The last question to be decided is whether any, and if any, how much, of the demanded premises were subject to the trust deed of 1852.    That lots 1, 5, 6, 9 and 10, and an undivided half of lots 3, 7 and 8 according to the Jones survey were covered by the 1852 deed is not in dispute.    The railroad company owned these lots in 1852.    They were a part of "the real estate to the company belonging," all of which was covered by the deed.    But the remainder of the demanded premises was not then owned by the company and was not covered by the deed and has not come to the plaintiff, unless it was such after acquired property as the 1852 deed purported to convey.    It is contended, indeed, that the directors had no authority to mortgage after acquired property.    The directors of the railroad company were authorized by a corporate vote to mortgage the franchise and property "held by said company." This vote clearly related to property then held by the company, and not to after acquired property.    And without considering at all whether the directors had independent power to mortgage, when it appears, as in this case, that the directors act under the special authority of a corporate vote, and the terms and limitations of that authority are disclosed in the mortgage itself, we think it may well be doubted whether their mortgage of property not included in the vote has any effect whatever as to that property.

But we think that the trust deed properly construed does not purport to include any after acquired land which might lie.outside the railroad location, or which was not used or available for use, for the operation of the railroad. The words of such a deed "are to be strictly construed, and no land or property is included unless clearly within the meaning of the words of the instrument." 3 Cook on Corporations, sect. 856. The deed speaks of two classes of real estate, that appertaining to the "railroad," and that belonging to the company. It uses different language as to each. In one case, it is the "railroad and franchise . . . . as the same is now established, constructed or improved, or as the same may be at any time hereafter legally established, constructed and improved . . . . with all lands, buildings and fixtures of every kind thereto belonging." The other description is "all real estate to said company belonging." We think we should not disregard this difference. The provision relating to after acquired property is in terms confined to the "railroad" and franchise, and the lands belonging "thereto," "that is, to the "railroad." The words "established, constructed and improved," seem clearly to apply to the railroad itself, as distinguished from other land of the company. They are not appropriate to real estate owned by the company, but not a part of the "railroad" itself. Besides, unless it was intended by the deed to make a distinction between lands belonging to the "railroad," and other real estate belonging to the company, there was no occasion for inserting the clause "all real estate to said company belonging." We conclude that this latter clause related only to real estate then held or owned by the company, which was not a part of the railroad itself, and that no after acquired property was intended to pass, or did pass, by the 1852 deed, except such as appertained to the "railroad" itself. See *Eldridge* v. *Smith*, 34 Vt. 484; *Walsh* v. *Barton*, 24 Ohio St. 28; *Boston &c. R. R.* v. *Coffin*, 50 Conn. 150; *Morgan* v. *Donavon*, 58 Ala. 241; *Randolph* v. *New Jersey &c. R. R.*, 28 N. J. Eg. 49; *Dinsmore* v. *Racine &c. R. R.*, 12 Wis. 649; *Shamokin Valley R. R.* v. *Livermore*, 47 Pa. St. 465.

It follows that of the demanded premises the plaintiff has title to lots 1, 5, 6, 9 and 10, and an undivided half of lots 3, 7 and 8, and only to so much of the after acquired lots, if any, as lies within the railroad location, or as was acquired for and was used in connection with the operation of the railroad. But the case fails to show that any part of these latter lots, within the limits of the premises demanded in the writ, were a part of the "railroad," as hereinbefore defined. The plaintiff therefore is entitled to judgment for so much of lots 1, 5, 6, 9 and 10, and of an undivided half of lots 3, 7 and 8, as lies between the St. Croix River and a line drawn eight feet from the shore rail of the plaintiff's railroad, and no more; and also for the flowage rights appurtenant thereto.

*Judgment accordingly.*