ROBINSON TRANSPORTATION COMPANY, Inc., a corporation, and St. Paul Fire and Marine Insurance Company, a corporation, Appellants (Defendants below),

Melvin Freese, dba Freese-Penton Trucking Company, et al. (Defendants below),

v.

HAWKEYE–SECURITY INSURANCE COMPANY, Appellee (Plaintiff below).

No. 3125.

Supreme Court of Wyoming.

Sept. 11, 1963.

G. L. Spence and Spence, Hill, Oeland & Tschirgi, Riverton, for appellants.

Morris R. Massey, of Brown, Healy, Drew, Apostolos & Barton, Casper, for appellee.

Before PARKER, C. J., and HARNSBERGER, GRAY, and McINTYRE, JJ.

Mr. Chief Justice PARKER delivered the opinion of the court.

Plaintiff, Hawkeye-Security Insurance Company, insurer of Melvin Freese, brought a declaratory judgment action against him; Robinson Transportation Company; St. Paul Fire and Marine Insurance Company, its insurer; and various other defendants allegedly injured when a Freese truck, parked by an employee of Robinson Transportation Company, rolled down an incline. The judgment decreed that the Freese runaway truck was at the time of the accident under the exclusive control and responsibility of the Robinson company and was then covered by the policy of the St. Paul company and was excluded from the Hawkeye policy. The Robinson and St. Paul companies have appealed, raising issues as to the relationship which existed between Freese and the Robinson company at the time of the accident and posing incidental questions concerning the responsibility of the parties.

It is undisputed that on April 18, 1961, a truck-trailer unit owned by Freese and loaded with electrical conduit, part of an interstate shipment of goods consigned to Patterson-Emerson-Comstock Company, an electrical subcontractor, was parked within the Atlantic City compound of the Columbia-Geneva steel plant, then under construction. The vehicle had been driven from the railhead into the compound by a driver in the general employ of Freese and was thereafter, in accordance with a mutual agreement between the two employers, arising out of certain labor troubles, turned over to Paul Robertson, a truck driver in the general employ of the Robinson company. After Robertson had parked the truck, it rolled down the incline into a time shack, injuring several men and destroying certain property.

According to appellants' view, the undisputed evidence showed either that there was a joint venture between Freese and Robinson or that Freese was an independent contractor who at the time of the accident had borrowed Robinson's servant; that the trial court erred in failing to so conclude, when it found that Robertson was solely controlled by Robinson, since the man who parked the truck was at that time furthering the business interest of Freese; and that the trial court also erred in concluding that the Freese truck had been obtained by Robinson "on a borrowing basis * * * as needed from day to day."

There is little conflict concerning the occurrences prior to the accident. The Robinson company is a common carrier authorized both by the State of Wyoming and the Interstate Commerce Commission to haul freight over certain designated routes in the State and particularly between Lander and Atlantic City. In 1960 its officials learned that the company would be called upon to haul conduit and electrical supplies from the railhead at Lander to the site of the Atlantic City plant and knowing that the company had neither sufficient men nor equipment to accomplish such transportation service contacted Freese to discuss assistance in the movement of material. Freese had been authorized to operate intrastate but held no ICC authority. There were several discussions between Freese and the president of the Robinson company, both parties apparently understanding that because of the mentioned circumstances Freese would help in the movement of the material; would furnish without charge a trailer to be pulled by a Robinson tractor, making a complete unit for Robinson; and would also furnish one additional tractor-trailer to be used in the hauling. Freese's drivers, all except one, were nonunion and it had developed that trucks would not be

unloaded if driven to the unloading point by them. It would, therefore, be necessary for one of Robinson's drivers to take over the Freese unit to drive within the compound for the actual unloading. Freese furnished a winch truck which was used in loading both his and the Robinson unit from the rail cars and he was to be compensated therefor at a specified hourly rate as he was for labor in the loading. All billing was to be done by the Robinson company. There is some conflict in the evidence as to Freese's obligation to furnish drivers on the trip between Lander and Atlantic City. The Robinson company president said that in return for Freese's loaning his company the trailer it was to furnish without charge a driver to park the Freese unit for the unloading within the compound. Although Freese at one point said he was to be compensated at an hourly rate for the material transported, according to the gist of the testimony he was to receive twenty-eight cents per hundredweight for the material delivered at Atlantic City, which was the same amount as that paid to Robinson under the ICC rate. Before the commencement of the transportation, a new tariff of twenty-nine cents per hundredweight was put into effect, but the Robinson company kept the additional cent together with small overages to cover the cost of long-distance telephone calls, bookkeeping, billing, and other overhead. When the Robinson company was advised of a shipment where Freese's services were necessary, it notified Freese and the Robinson and Freese units were loaded together, proceeding to Atlantic City under Robinson waybills. Freese units were used for his own purposes in the back haul. Each party bore his own cost of gas, oil, repairs, depreciation, etc., and took care of his social security and workmen's compensation. Each admittedly had the right to hire and fire. The Robinson company usually selected the day of transportation, Freese determining the hour in the light of other business he had. Freese referred to the trucking service as a "lease," but he carried the matter in his own books as a "trucking charge."

■ As to the parties being joint adventurers, we look first to the nature of that relationship. Since the term is of recent origin, created by the courts of the United States, it may not be as clear as if the concept had been long embedded in the common law. However, there would seem to be no question that under any view of the relationship the joint adventurers would necessarily share both in the profits and losses. 48 C.J.S. Joint Adventures § 11; and see Wyoming-Indiana Oil & Gas Co. v. Weston, 43 Wyo. 526, 7 P.2d 206, 208–209, 80 A.L.R. 1037; Hoge v. George, 27 Wyo. 423, 200 P. 96, 98–99, 18 A.L.R. 469; Reece v. Rhoades, 25 Wyo. 91, 165 P. 449, 453. As was succinctly stated by this court in Wyoming-Indiana Oil & Gas Co. v. Weston, supra, 7 P.2d at 208: Where the existence of the relationship is in issue, the question is pre-eminently one for the finder of fact. In the present case the evidence disclosed no intention for Freese and the Robinson company to share either the profits or the losses, and the finding of the court to that effect was fully justified. Accordingly, there was no joint venture.

■ The contention that Robertson, the man who was in charge of the truck immediately prior to the accident, was a borrowed servant of Freese, becomes meaningful only if Freese was an independent contractor. This the appellees do not admit, but it may be desirable for the purpose of preliminary analysis to assume such status so that attention may be focused on the borrowed servant argument. Appellants allude to the borrowed servant doctrine, and say that it has been widely applied in situations analogous to the one at bar, citing general encyclopedic authorities wherein the following statements occur:

"The fact that a person is the general servant of one employer does not, as matter of law, prevent him from becoming the particular servant of another, who may be held liable for his acts. Indeed, as a general proposition, if one person lends his servant to another for a particular employment,

the servant, for anything done in that employment, is dealt with as the servant of the one to whom he has been lent, although he remains the general servant of the person who lent him. * * *" 35 Am.Jur. Master and Servant § 541. "Although various elements may tend to indicate the existence of a master and servant relation, no one fact or circumstance is necessarily conclusive; ordinarily the question is one of fact to be determined from all the circumstances of the case." 56 C.J.S. Master and Servant § 2.

A number of Wyoming cases are cited as dealing with this doctrine: Yeoman v. Fulton, Wyo., 366 P.2d 694; Rocky Mountain Trucking Company v. Taylor, 79 Wyo. 461, 335 P.2d 448; Tyler v. Jensen, 75 Wyo. 249, 295 P.2d 742; Blessing v. Pittman, 70 Wyo. 416, 251 P.2d 243; Phelps v. Woodward Const. Co., 66 Wyo. 33, 204 P.2d 179. However, the facts of each of these are distinguishable from those in the case at bar so that they are helpful only in the enunciation of rules and by way of comparison. In Blessing v. Pittman, supra, 251 P.2d at 246, and again in Tyler v. Jensen, supra, 295 P.2d at 749, it was said, "Most of the courts hold that the test is as to who controls the servant, or rather who has the right of control." In Yeoman v. Fulton, supra, 366 P.2d at 698, we approved comment b under § 227, A.L.I. Restatement, Second, Agency (1958): "In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment as long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it." In the same case we noted that it was within the province of the finder of fact to determine from the evidence whether or not the servant was loaned to a special employer so as to relieve the general employer from liability. Here Robertson was without question acting in accordance with the understanding between the Robinson company and Freese. There is no evidence that he was given any specific instructions by Freese or that he acted other than by his own initiative and because of conversation between him and Freese's driver. Thus, the inference that he remained in the general employment of the Robinson company was not overcome, and there was substantial evidence to warrant the finding that he was an employee of the Robinson company at the time of the accident.

Much criticism is directed by the defendants to the statement of the trial court "that at all times the Robinson Transportation Company had full responsibility for the safe delivery of said conduit to the mill site as such common carrier, and it necessarily followed that said company at all times had the right to control the men and equipment used in the transportation of said commodity, and it therefore must follow that the use by Robinson of the Freese men and equipment was done on a borrowing basis by Robinson as needed from day to day." Whether or not the court's logic in this pronouncement is subject to challenge is unimportant. As Judge Blume said in Chesney v. Valley Live Stock Co., 34 Wyo. 378, 244 P. 216, 221, 44 A.L.R. 1255, "[The court] arrived at the correct conclusion, and we cannot reverse the case, because such conclusion is founded partially or wholly upon the wrong premises."

Judgment affirmed.